IN THE SUPREME COURT OF NORTH CAROLINA

No. 269PA09-2

FILED 28 AUGUST 2013

TRAVIS T. BUMPERS and TROY ELLIOTT, on behalf of themselves and all others similarly situated

v.

COMMUNITY BANK OF NORTHERN VIRGINIA

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 718 S.E.2d 408 (2011), affirming in part and reversing, vacating, and remanding in part orders granting partial summary judgment for plaintiffs and awarding damages entered on 28 April 2008 and 15 May 2008, both by Judge John B. Lewis, Jr. in Superior Court, Wake County. Heard in the Supreme Court on 7 January 2013.

*Hartzell & Whiteman, L.L.P., by J. Jerome Hartzell, for plaintiff-appellees.*

*Ellis & Winters LLP, by Matthew W. Sawchak, Stephen D. Feldman, Kelly Margolis Dagger, and Meghan Skirving Thelen, for defendant-appellant.*

*Robinson, Bradshaw & Hinson, P.A., by John R. Wester and Adam K. Doerr, for NC Chamber, amicus curiae.*

*NC Justice Center, by Carlene McNulty, and Center for Responsible Lending, by Michael D. Calhoun, amici curiae.*

*North Carolina Department of Justice, by Gary R. Govert, Assistant Solicitor General, and Philip A. Lehman, Assistant Attorney General, for Roy Cooper, Attorney General, amicus curiae.*

NEWBY, Justice.

In this case we explore the application of section 75-1.1 of our General Statutes, the unfair and deceptive practices statute, to the consumer loan market. First, we must decide whether an action for misrepresentation under section 75-1.1 requires reliance by a borrower who accuses a lender of collecting a fee for a discounted loan without actually charging a discounted interest rate. Second, we must determine whether section 75-1.1 imposes a price ceiling on the fees a closing services provider may charge in connection with closing a loan.

Section 75-1.1 has long encompassed conduct tantamount to fraud, which requires reliance, and we see no reason for departure from that requirement when the actions alleged include the misrepresentation of a loan transaction that caused injury. Even so, there are issues of material fact regarding whether the conduct proscribed by the first claim actually occurred in this case. Further, section 75-1.1 does not prescribe the amount of fees that may be charged in exchange for closing a loan transaction that was freely entered in the open market. Because the trial court improperly allowed summary judgment for plaintiffs on both claims which the Court of Appeals did not correctly reverse, we reverse the decision of the Court of Appeals.

In 1999 plaintiffs Travis Bumpers (Bumpers) and Troy Elliott (Elliott) obtained loans from defendant Community Bank of Northern Virginia (Community

Bank).  According to Bumpers, he received a mailed solicitation from Community Bank inviting him to apply for a loan.  At that time he had credit card debt carrying a high interest rate, and he also wanted to perform some home improvements. Bumpers sought a loan from Community Bank, which ultimately gave him a loan with an interest rate of 16.99%.  Reasoning that this interest rate was decidedly lower than the rate on his credit card debt, Bumpers borrowed $28,450.00 from Community Bank, executing a promissory note for that principal amount, which was secured by a second deed of trust on his main residence.  Bumpers completed this loan transaction without first asking about the amount of the discount he was receiving or considering whether another lender would have offered better terms, though he was aware that he was free to do so.

In connection with the issuance of the loan, Bumpers paid various fees totaling $4,827.88.  Community Bank charged him a total of $3,622.88, including a $1,280.25 loan discount fee, for services associated with originating the loan,[1] and Title America, LLC, a settlement agent affiliated with Community Bank, imposed the remaining fees.[2]  Bumpers stated that he "thought the fees would be a little more" because a second mortgage places more "risk" on the bank.  Further, Bumpers was not concerned with the services he received in exchange for each fee;

---

[1] Bumpers paid Community Bank a loan origination fee of $2,062.63, a loan discount fee of $1,280.25, an application fee of $95.00, and an underwriting fee of $185.00.

[2] Bumpers paid Title America, LLC a settlement or closing fee of $225.00, an abstract or title search fee of $120.00, a title examination fee of $300.00, an overnight fee of $25.00, a document review fee of $275.00, and a processing fee of $260.00.

rather, he focused only on the total amount necessary to obtain the loan. And as with the loan itself, Bumpers declined to shop around for a less expensive settlement service provider, even though he was aware that he was free to do so. Bumpers paid the fees imposed, and in September 2002 he repaid his loan.

Elliott similarly obtained a loan after receiving a mailing from Community Bank. Elliott compared the interest rates of competing institutions with that available from Community Bank. Elliott then decided to obtain a loan from Community Bank because of its lower interest rate. Ultimately, Elliott agreed to borrow $35,000.00 at an interest rate of 12.99%. In connection with that loan, Elliott paid $5,650.00 in fees, including a $1,400.00 loan discount fee to Community Bank and $1,145.00 in closing fees to Title America, LLC.[3] After obtaining this loan, Elliott acknowledged, but did not exercise, his right to cancel the loan without cost.

In 2001 plaintiffs, on behalf of themselves and all those similarly situated, filed a complaint in the Superior Court, Wake County, alleging in relevant part that Community Bank's loan transactions violated North Carolina's unfair and deceptive practices statute. More specifically, plaintiffs asserted that they paid loan discount fees, but did not receive discounted loans. Plaintiffs also alleged that the fees they

---

[3] Elliott also paid Community Bank a $2,800.00 loan origination fee, a $95.00 application fee, and a $185.00 underwriting fee. Title America, LLC charged Elliott $225.00 for a settlement or closing fee, $120.00 for an abstract or title search, $300.00 for a title examination, $25.00 for an overnight fee, $250.00 for a document review fee, and $250.00 for a processing fee.

were charged in connection with origination of their loans were unnecessary and unreasonable. Plaintiffs contended that Community Bank's conduct amounted to a violation of section 75-1.1 of our General Statutes, which prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C.G.S. § 75-1.1 (2011).

On 5 February 2008, plaintiffs moved for partial summary judgment against Community Bank.[4] Arguing in support of their motion, plaintiffs first addressed their claims regarding Community Bank's loan discount fees.[5] They argued that the HUD-1A Settlement Statements completed in connection with their loans from Community Bank show that they paid loan discount fees in excess of $1,000.00 each—$1,280.25 for Bumpers and $1,400.00 for Elliott—in addition to other loan origination fees. Plaintiffs alleged that according to the United States Department of Housing and Urban Development, which promulgates the HUD-1A form, "the term 'loan discount' as used in line 802 of [the HUD-1A] . . . is 'a one-time charge imposed by the lender or broker to lower the rate at which the lender or broker would otherwise offer the loan to you.' " Plaintiffs stated that Mary Jo Speier,

---

[4] This case has travelled some distance through the courts of both North Carolina and the United States. While we discuss the procedural history of the case to the extent necessary for a full understanding of the issues presented, it is decidedly more extensive than is set forth in the text here. See our earlier opinion, *Bumpers v. Cmty. Bank of N. Va. (Bumpers I)*, 364 N.C. 195, 695 S.E.2d 442 (2010), for a more detailed discussion, and see the opinions of the United States Court of Appeals for the Third Circuit, *In re Cmty. Bank of N. Va.*, 418 F.3d 277 (3d Cir. 2005), and *In re Cmty. Bank of N. Va.*, 622 F.3d 275 (3d Cir. 2010), for additional background.

[5] Plaintiffs did not move for summary judgment on behalf of the class of those individuals similarly situated. The United States District Court for the Western District of Pennsylvania had previously entered an order barring plaintiffs from attempting to obtain certification of this case as a class action.

President of Title America, LLC, agreed with the federal government's definition. Plaintiffs asserted that Community Bank did not, however, provide discounted loans, pointing to Community Bank's loan transmittal documents which had a checked box next to the word "no" under the heading "Buydown." Plaintiffs maintained that this checked box showed that they did not receive discounted loans. As a result, plaintiffs contended they were entitled to summary judgment on their claims that Community Bank charged them for services it did not provide, in violation of section 75-1.1 of our General Statutes.

Second, plaintiffs also forecast evidence in support of their excessive pricing claims. Plaintiffs alleged that they paid over $1,000.00 each—$1,180.00 for Bumpers and $1,145.00 for Elliott—in closing costs to Title America, LLC. They asserted, however, that during the relevant time period the average cost in North Carolina "for an attorney to handle a second mortgage loan, including title search and 'live closing,' ranged between $258 and $324." Plaintiffs averred that Community Bank's closings were quite cursory and much less involved than if conducted by attorneys. Finally, plaintiffs asserted that $400 is "the upper limit of reasonable charges for the settlement agent." As a result, the fees charged for the closings were excessive, in violation of section 75-1.1. Plaintiffs also claimed that, though the closing fees were charged by Title America, LLC, Community Bank should be responsible because of its relationship with Title America, LLC.

Community Bank opposed plaintiffs' motion for partial summary judgment. Community Bank argued, *inter alia*, that plaintiffs failed to demonstrate reliance on its alleged misrepresentations that discounted loans would be provided, which Community Bank contended is required to prevail on a misrepresentation claim under section 75-1.1. Further, Community Bank responded that a statement from its former Mortgage Operations Officer, John Grace, at least created an issue of material fact regarding whether plaintiffs actually received discounted loans. Mr. Grace's statement explained that the box indicating that there was no "buy-down" actually does not address whether plaintiffs received discounted interest rates. Rather, that checked box referenced "whether the borrower obtained a temporary buy-down of the interest rate, a feature which was" inapplicable to second mortgage loans, including plaintiffs'. He concluded by stating that "[t]his section does not in any way address whether the borrower's interest rate was a discounted interest rate." Regarding plaintiffs' excessive pricing claims, Community Bank argued that such claims were simply not actionable under section 75-1.1.

On 28 April 2008, the trial court allowed plaintiffs' motion for partial summary judgment. First addressing the loan discount claims, the trial court determined that each plaintiff paid a loan discount fee, which is a fee to reduce a loan's interest rate. Nonetheless, the trial court found that Community Bank's loan documents, which had "the 'no' block checked under 'Loan buydown,' " showed that no discounted interest rates were given. This, according to the trial court,

constituted an unfair or deceptive practice under section 75-1.1. The trial court acknowledged Mr. Grace's statement about the inapplicability of the provision, but reasoned that the statement "does not contradict the materials put forward by plaintiffs: Mr. Grace does not state that [plaintiffs] in fact received . . . 'discounted' or 'bought down' interest rate[s], but rather confirms that [plaintiffs] did not receive one sort of 'bought down' interest rate.' " As a result, the trial court determined that there was "no dispute in the evidence" that plaintiffs did not receive loans with bought down interest rates in exchange for the loan discount fees they paid.

The trial court also entered summary judgment on plaintiffs' excessive pricing claims. The trial court found that Bumpers paid $1,180.00 and Elliott paid $1,145.00 for closing services, which was in excess of the $400 "maximum reasonable charge" for those services during the relevant time period. The trial court ultimately concluded that the various itemized fees, which collectively composed the amount paid for closing services, appeared to be redundant and duplicative and that Community Bank engaged in systematic overcharging in violation of section 75-1.1.

On 15 May 2008, the trial court entered a final order, directing Community Bank to pay Bumpers damages equal to the amount he paid for a loan discount, which with interest totaled $1,864.78, and damages in the amount of the difference between the price plaintiff paid for closing services and the maximum reasonable price, which with interest totaled $1,136.13. Using a similar computation, the trial

court awarded Elliott damages of $3,243.96.  Because the trial court determined Community Bank's conduct violated section 75-1.1, the trial court trebled the award of damages under section 75-16, awarding Bumpers $9,002.72 and Elliott $9,731.88. Community Bank appealed.

The Court of Appeals affirmed in part and reversed in part the trial court's orders on summary judgment.[6]  *Bumpers v. Cmty. Bank of N. Va.*, ___ N.C. App. ___, ___, 718 S.E.2d 408, 415 (2011).  First, regarding plaintiffs' loan discount claims, the Court of Appeals agreed with Community Bank that generally a plaintiff asserting a claim under section 75-1.1 based on misrepresentation must show reliance to establish proximate cause.  *Id.* at ___, 718 S.E.2d at 413 (citation omitted).  The Court of Appeals reasoned, however, that plaintiffs' claims were not based on misrepresentations, and thus the court did not consider whether reliance was present.  *Id.* at ___, 718 S.E.2d at 413.  Rather, the court viewed the claims as essentially claims for systematic overcharging based on its earlier decision in *Sampson-Bladen Oil Company. v. Walters*.  *Bumpers*, ___ N.C. App. at ___, 718

---

[6] The Court of Appeals initially dismissed Community Bank's appeal as interlocutory because the trial court had not resolved the issue of attorney's fees.  *Bumpers v. Cmty. Bank of N. Va.*, 196 N.C. App. 713, 675 S.E.2d 697 (2009).  In *Bumpers I* we reversed that decision and remanded the case to the Court of Appeals for consideration of the merits of Community Bank's appeal.  364 N.C. at 204-05, 695 S.E.2d at 448-49.  We noted in our decision in *Bumpers I* that Elliott was not a participant in that appeal.  *Id.* at 196 n.1, 695 S.E.2d at 443 n.1.  Elliott has represented to this Court that his nonparticipation was the result of an order by the United States District Court for the Western District of Pennsylvania.  Elliott's involvement, however, is immaterial for purposes of our decision, and, given our disposition of this case, Elliott's relationship to this case should crystalize upon remand.

S.E.2d at 412-13.  After characterizing the claims, the Court of Appeals concluded that the "undisputed evidence in the record demonstrates that plaintiffs did not receive a discounted interest rate on the[ir] loan[s] as a *quid pro quo* for paying the loan discount fee[s]."  *Id.* at ___, 718 S.E.2d at 413.  As a result, the court affirmed entry of summary judgment on plaintiffs' loan discount claims.  *Id.* at ___, ___, 718 S.E.2d at 412-13, 415.  The court, however, reversed the trial court's decision regarding the excessive fees claims, explaining that an issue of material fact remained about whether Title America, LLC actually overcharged for its services. *Id.* at ___, 718 S.E.2d at 414-15.  By doing so, the Court of Appeals implicitly recognized that section 75-1.1 provides a cause of action for excessive pricing.  *See id.* at ___, 718 S.E.2d at 414-15.  Community Bank then sought discretionary review in this Court, which we allowed.  *Bumpers v. Cmty. Bank of N. Va.*, 366 N.C. 243, 731 S.E.2d 141 (2012).

Now we must decide whether the Court of Appeals erred by affirming the entry of summary judgment on plaintiffs' loan discount claims and in recognizing a claim for excessive pricing.  In making this determination we review the trial court's order de novo to ascertain whether summary judgment was properly entered. *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004) (citation omitted).  "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party

is entitled to a judgment as a matter of law.' " *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting N.C.G.S. § 1A-1, Rule 56(c) (2011)). Our review necessarily begins with an examination of our unfair and deceptive practices statute and applicable precedent.

Section 75-1.1 of our General Statutes states in pertinent part that "unfair or deceptive acts or practices in or affecting commerce[ ] are declared unlawful." N.C.G.S. § 75-1.1(a). This statute is broader and covers more than traditional common law proscriptions on tortious conduct, though fraud and deceit tend to be included within its ambit. *See Marshall v. Miller*, 302 N.C. 539, 543-44, 276 S.E.2d 397, 400 (1981). The statute does not, however, prohibit all wrongful conduct stemming from commercial transactions; section 75-1.1 does not, for example, apply to an individual who merely breaches a contract. *Mitchell v. Linville*, 148 N.C. App. 71, 74, 557 S.E.2d 620, 623 (2001) ("Neither an intentional breach of contract nor a breach of warranty . . . constitutes a violation of Chapter 75." (citations omitted)).

The General Assembly has provided a means to enforce the mandate of section 75-1.1. Section 75-16 allows any individual who has been "injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter" to bring a civil action. N.C.G.S. § 75-16 (2011). "In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused

injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001) (citation omitted). For purposes of plaintiffs' loan discount claims, the proximate cause element is at issue here.

Community Bank argues that, to establish proximate cause in a claim for misrepresentation under section 75-1.1, a plaintiff must show reliance on the allegedly misrepresented statement. Community Bank asserts that plaintiffs' loan discount claims in this case are based on an alleged misrepresentation on which plaintiffs have failed to adequately establish their reliance. Community Bank argues that plaintiffs did not enter into their loan transactions because they believed they were receiving discounted loans, but instead decided to obtain their loans based on the total fees and the interest rates. As a result, Community Bank contends that summary judgment was entered improperly.

We agree with Community Bank that a claim under section 75-1.1 stemming from an alleged misrepresentation does indeed require a plaintiff to demonstrate reliance on the misrepresentation in order to show the necessary proximate cause. Such a requirement has been the law of this state for quite some time. *See Pearce v. Am. Defender Life Ins. Co.*, 316 N.C. 461, 471, 343 S.E.2d 174, 180 (1986) ("It must be shown that the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation." (citation omitted)). The Court of Appeals agreed with Community Bank on this contention as well, stating that when " 'an unfair or deceptive practice claim is based upon an alleged

misrepresentation by the defendant, the plaintiff must show "actual reliance" on the alleged misrepresentation in order to establish that the alleged misrepresentation "proximately caused" the injury of which plaintiff complains.' " *Bumpers*, ___ N.C. App. at ___, 718 S.E.2d at 413 (quoting *Tucker v. Blvd. at Piper Glen LLC*, 150 N.C. App. 150, 154, 564 S.E.2d 248, 251 (2002)). But, after correctly citing the controlling rule, the Court of Appeals mischaracterized plaintiffs' claims as based not on misrepresentations but as claims for systematic overcharging similar to those at issue in *Sampson-Bladen Oil Co. v. Walters*. *Id.* at ___, 718 S.E.2d at 413. By doing so, the Court of Appeals erroneously distinguished overcharging from misrepresentation, finding proximate cause without considering whether plaintiffs presented sufficient evidence of reliance.

We disagree with the Court of Appeals' interpretation of *Sampson-Bladen Oil* and the implication that there is no requirement for plaintiffs to demonstrate that they relied on the alleged misrepresentations. In *Sampson-Bladen Oil* a fuel oil supplier regularly, for a period of several years, overcharged one of its customers by misrepresenting the volume of oil that had been delivered. 86 N.C. App. 173, 177, 356 S.E.2d 805, 808, *disc. rev. denied*, 321 N.C. 121, 361 S.E.2d 597 (1987). The Court of Appeals held that such conduct amounted to a violation of section 75-1.1. *Id.* (stating "it seems plain to us, and we so hold, that systematically overcharging a customer for two years, as the jury found was done here in the amount of $2,795.30, is an unfair trade practice"). Yet, a claim for overcharging is not distinct from one

based on misrepresentation. In *Sampson-Bladen Oil* the customer complained that the fuel oil supplier misrepresented in its bills how much oil was delivered and that the customer was damaged by making payments in reliance on those bills. *See id.* at 173-75, 356 S.E.2d at 806-07.

Reliance, in turn, demands evidence "show[ing] that the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation." *Pearce*, 316 N.C. at 471, 343 S.E.2d at 180. We previously likened such burden of proof to that of the "detrimental reliance requirement under a fraud claim." *Id.* In making this inquiry we examine the mental state of the plaintiff. Two key elements specific to the plaintiff combine to determine detrimental reliance: (1) actual reliance and (2) reasonable reliance. *See id.* at 472, 343 S.E.2d at 181 (weighing the testimony of the plaintiff widow to decide if evidence supported claim of actual reliance by her husband); *see also Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007) ("[A]ny reliance on the allegedly false representations must be reasonable." (citation omitted)).

In the context of a misrepresentation claim brought under section 75-1.1, actual reliance requires that the plaintiff have affirmatively incorporated the alleged misrepresentation into his or her decision-making process: if it were not for the misrepresentation, the plaintiff would likely have avoided the injury altogether. *See Hageman v. Twin City Chrysler-Plymouth Inc.*, 681 F. Supp. 303, 308 (M.D.N.C. 1988) ("[A] plaintiff must prove that he or she detrimentally relied on the

defendant's . . . misrepresentation." (interpreting *Pearce*, 316 N.C. at 471, 343 S.E.2d at 180)); *see also Tucker*, 150 N.C. App. at 154, 564 S.E.2d at 251 ("[T]he plaintiff must show 'actual reliance' on the alleged misrepresentation in order to establish that the alleged misrepresentation 'proximately caused' the injury of which plaintiff complains." (citation omitted)).  The second element, reasonableness, is most succinctly defined in the negative: "Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 26, 581 S.E.2d 452, 458 (citations omitted), *disc. rev. denied*, 357 N.C. 511, 588 S.E.2d 473 (2003).  Additionally, in cases concerning the existence of actual and reasonable reliance, "when there are genuine issues of material fact that are legitimately called into question, summary judgment should be denied and the issue preserved for the jury." *Howerton*, 358 N.C. at 471, 597 S.E.2d at 694 (applying N.C.G.S. § 75-1.1 and finding a genuine issue of material fact regarding the plaintiff's reliance on the defendant's advertisements).  Consequently, the Court of Appeals erred by not considering whether plaintiffs presented conclusive evidence of their actual and reasonable reliance on defendant's alleged misrepresentations.

Further, Community Bank's evidence raises another genuine issue about an entirely different material fact: whether plaintiffs actually received discounted loans.  Because plaintiffs' claims assert that they were injured when they paid for discounted loans they did not receive, the determination of whether they did, in

fact, receive discounted loans is critical. This is a point on which there is conflicting evidence, giving rise to an issue of material fact.

Plaintiffs successfully argued to the trial court in support of their motion for partial summary judgment that Community Bank's loan transmittal documents, which had "no" checked under the heading "Buydown" and did not list a "Bought Down Rate," established that they did not actually receive discounted loans. In response, former Community Bank Mortgage Operations Officer, John Grace, explained that the sections of the loan transmittal documents plaintiffs sought to use to establish they did not receive discounted loans do not actually stand for that proposition. While, as plaintiffs suggest, the loan transmittal documents do appear to indicate plaintiffs did not receive discounted loans, Mr. Grace's statement draws that inference into question, creating a genuine issue of material fact. Thus, summary judgment on these loan discount claims was inappropriate.

Community Bank also contends that the Court of Appeals erred by holding that section 75-1.1 recognizes a claim for excessive pricing that would prohibit the fees plaintiffs paid for closing services. Community Bank asserts that nothing in the general language of section 75-1.1 reflects a legislative intent to place our trial courts in the position of price regulators. Further, Community Bank argues that by enacting a separate statute prohibiting certain businesses from charging "unreasonably excessive" prices during certain, specified events, the General Assembly intends not to regulate prices generally through section 75-1.1.

As we have observed, section 75-1.1 prohibits certain "unfair or deceptive" conduct. N.C.G.S. § 75-1.1. This Court has previously explained these terms. *E.g.*, *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 72, 653 S.E.2d 393, 399 (2007). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," and a "practice is deceptive if it has the capacity or tendency to deceive." *Id.* (citation and quotation marks omitted). Plaintiffs contend that charging closing fees roughly three times as high as the upper end of a range they find to be reasonable satisfies the "unfair or deceptive" requirement of a claim under section 75-1.1.

In most cases, there is nothing unfair or deceptive about freely entering a transaction on the open market. Indeed, in condemnation proceedings our legislature actually deems the "fair market value" of real property to be a just measurement of its value when compensating a property owner for its taking. N.C.G.S. § 136-112(2) (2011). The term market value has been defined as the actual sale price "by a seller willing but not obliged to sell, to a buyer willing but not obligated to buy." *N.C. State Highway Comm'n v. Helderman*, 285 N.C. 645, 654, 207 S.E.2d 720, 727 (1974) (citation and quotation marks omitted); *see also* 24 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 64:4, at 50 (4th ed. 2002). As a result, when transacting parties willingly and honestly

negotiate a transaction, generally the transaction is not said to be unfair or deceptive.

Our legislature has created an exception to this prevailing rule in section 75-38 of our General Statutes. In that section the General Assembly made it illegal and a violation of section 75-1.1 to engage in price gouging during an emergency or during an abnormal market disruption. N.C.G.S. § 75-38 (2011). When such an event occurs individuals may not "sell or rent or offer to sell or rent any goods or services which are consumed or used as a direct result of an emergency or which are consumed or used to preserve, protect, or sustain life, health, safety, or economic well-being of persons or their property with the knowledge and intent to charge a price that is unreasonably excessive under the circumstances." *Id.* § 75-38(a). The legislature listed several factors that must be considered in determining "whether a price is unreasonably excessive," including whether the "price charged by the seller is attributable to additional costs imposed by the seller's supplier or other costs of providing the good or service during the triggering event." *Id.* § 75-38(a)(1). This section's prohibition on "unreasonably excessive" prices expires at the end of the "triggering event." *Id.* § 75-38(c), (d). As a result, it seems our General Assembly has determined that when a buyer is under an extraordinary need on account of health, safety, or similar circumstances following an abnormal event, prices may become unlawfully excessive.

While there may be circumstances other than those described in section 75-38 when an unreasonably excessive price would constitute a violation of section 75-1.1, such circumstances are not present in this case. Plaintiffs entered into their loan transactions freely and without any compulsion. Bumpers obtained his loan to improve his financial condition, using its proceeds to retire existing debt with a higher interest rate and presumably to increase the value of another asset. Bumpers was informed and was aware that other closing agents existed and that those other agents might charge lower fees to close his loan from Community Bank. Nonetheless, Bumpers elected to close the transaction using Title America, LLC. Elliott was similarly aware of other lending and closing options and declined to use them. More to the point, while the record does indicate that the closing fees plaintiffs paid were higher than those charged by attorneys performing similar services at the time, the fees paid are not so high as to run afoul of section 75-1.1. Accordingly, it was error for the Court of Appeals to recognize these claims for excessive pricing.

The Superior Court, Wake County, improperly entered summary judgment for plaintiffs on their loan discount claims and their excessive pricing claims. The Court of Appeals erroneously affirmed the entry of summary judgment on plaintiffs' loan discount claims and, as a result, incorrectly remanded plaintiffs' excessive pricing claims after finding an issue of material fact. Because genuine issues of material fact exist in regards to plaintiffs' loan discount claims, and plaintiffs'

excessive pricing claims are not recognized by section 75-1.1, we reverse the decision of the Court of Appeals and remand this case to that court for further remand to the trial court for additional proceedings consistent with this opinion.

REVERSED AND REMANDED.


Justice HUDSON dissenting.

Because my review of the record persuades me that the trial court properly granted plaintiffs' motion for summary judgment on their claims regarding the loan discount fee, and because I conclude plaintiffs have sufficiently pleaded a claim for excessive pricing under N.C.G.S. § 75-1.1, I respectfully dissent.

The Court of Appeals held that summary judgment for plaintiffs was appropriate on their claims that they were wrongly charged a loan discount fee. Although the majority here concludes that genuine issues of material fact remain, I disagree. On this issue the record reveals that plaintiffs did not receive a discounted interest rate despite being charged a loan discount fee. On the Form 1008, a standard form created by Fannie Mae, the "no" block is checked in the "bought-down rate" box. In addition, the interest rate for which plaintiffs qualified was the interest rate they received; no further rate reduction is noted on the Form 1008 or elsewhere; the "qualifying rate" stated is the rate they ultimately received; and in addition to the "no" block being checked for the "bought-down rate," the

space to show a "bought-down rate" was left blank. No evidence to the contrary has been produced.

Defendant and the majority cite to evidence they contend shows otherwise. For example, defendant offers the affidavit of John Grace in an attempt to contradict plaintiffs' interpretation of the Form 1008; however, the affidavit does not actually contradict the form. At no point does Mr. Grace say that plaintiffs actually received a discounted rate; instead, he attempts to explain that the "bought-down rate" space on the form refers to a temporary rate reduction, not a permanent one. Further, in deposition testimony in a different but similar case, Mr. Grace testified that a "loan discount fee" is the same thing as a "loan origination fee." Despite this testimony and defendant's claims that the two terms are "often related loan terms," HUD has clearly defined the two terms as having very different meanings. U.S. Dep't of Hous. & Urban Dev., Office of Hous. – Fed. Hous. Admin., *Buying Your Home: Settlement Costs and Helpful Information* (June 1997). According to HUD, a "loan origination fee" is a fee that "covers the lender's administrative costs in processing the loan." *Id.* § III.A. ("Specific Settlement Costs"). A "loan discount fee" is a "one-time charge imposed by the lender or broker to lower the rate at which the lender or broker would otherwise offer the loan to you." *Id.* Moreover, as the majority points out in footnotes 1 and 3, plaintiffs each paid two separate amounts, $2,062.63 and $1,280.25, respectively, by plaintiff Bumpers, and $2,800.00 and $1,400.00, respectively, by plaintiff Elliot. Neither of

these attempts to contradict plaintiffs' evidence creates a genuine issue of material fact regarding whether plaintiffs were charged for a discount rate they did not receive. I disagree that the statements by defendant's employee "draw [the] inference into question" about the rate plaintiffs actually paid because Mr. Grace's testimony and affidavit do not appear to address that point at all. I would therefore hold that the trial court was correct in granting summary judgment for plaintiffs on their claim regarding the loan discount fee.

Further, I would not hold that actual reliance is a necessary element of plaintiffs' Section 75-1.1 claims that are based on systematic overcharging rather than misrepresentation.[7] First, the plain language of the statute does not require reliance. Section 75-1.1(a) simply states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C.G.S. § 75-1.1(a) (2011). Section 75-16, which gives force to Section 75-1.1, also contains no actual reliance language; it provides a right of action to anyone who is "injured." *Id.* § 75-16 (2011).

---

[7] Plaintiffs' Second Claim for Relief states in pertinent part:

> 23. The various fees charged to the named plaintiffs, and to members of the plaintiff class, are duplicative in that (among other things) the origination fee, the application fee, the underwriting fee, the processing fee, the closing fee and the document review fee are separate fees charged for overlapping functions and/or for the same function. Such fees are neither necessary nor reasonable charges, and violate applicable law limiting fees, G.S. 53-238 and G.S. 75-1.1.

Second, I agree with the Court of Appeals that this case is factually similar to *Sampson-Bladen Oil Co. v. Walters*, 86 N.C. App. 173, 356 S.E.2d 805 (1987). There the Court of Appeals held that it was an unfair trade practice for an oil company to charge its customers for oil they were not receiving. *Id.* at 177, 356 S.E.2d at 808-09. Here, contrary to what the majority asserts, the same thing has happened: defendant charged for a product that plaintiffs did not receive.

I also disagree with the majority that summary judgment was appropriate for defendant on plaintiffs' N.C.G.S. § 75-1.1 claim based on excessive pricing. I would hold that plaintiffs have articulated such a claim and would remand to the trial court for further proceedings because genuine questions of material fact remain.

Section 75-1.1(a) states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." As this Court has previously noted, the legislature's statement of purpose when it enacted the statute was

> "to declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business and between persons engaged in business and the consuming public within this State to the end that good faith and fair dealings between buyers and sellers at all level[s] of commerce be had in this State."

*Bhatti v. Buckland*, 328 N.C. 240, 245, 400 S.E.2d 440, 443 (1991) (alteration in original) (quoting *Threatt v. Hiers*, 76 N.C. App. 521, 522, 333 S.E.2d 772, 773 (1985), *disc. rev. denied*, 315 N.C. 397, 338 S.E.2d 887 (1986)). Further, section 75-

16, which establishes a civil cause of action for violations of section 75-1.1, was enacted "to create a new, private cause of action for aggrieved consumers since traditional common law remedies were often deficient." *Winston Realty Co. v. G.H.G., Inc.*, 314 N.C. 90, 95, 331 S.E.2d 677, 680 (1985) (citations omitted). These are broad statutes meant to protect consumers from a wide range of unfair trade practices. There is nothing in these provisions to suggest that excessive pricing cannot give rise to a cause of action under the statute.

While the majority ultimately holds that excessive pricing could constitute a violation of section 75-1.1, I write to highlight that the language of N.C.G.S. § 75-38 does not prohibit a claim for excessive pricing in circumstances other than those articulated in that portion of N.C.G.S. Chapter 75. Defendant argues that by enacting a statute that allows claims for excessive pricing in limited circumstances, such as a state of emergency, the legislature clearly did not intend to allow claims for excessive pricing in circumstances not named by the statute. However, I do not find this reasoning persuasive. Section 75-38 indicates a desire to tightly regulate emergency market situations but there is nothing in the statute to suggest that other market situations cannot be similarly regulated in addition. The mortgage industry is one such "other" market, and our legislature has already enacted several statutes to regulate it. For example, N.C.G.S. § 24-8(d) prohibits "unreasonable

compensation" when setting the amount of mortgage brokers' fees.[8] Buying a home is a traditionally important transaction and, given the recent mortgage lending crisis, it is not unreasonable for state legislatures to want to ensure fair practices among lenders.

I am also not convinced that allowing claims for excessive pricing would force trial courts to set price ceilings or lead to the creation of judicially unmanageable standards, as argued by defendant. As stated above, section 75-38 allows claims for excessive pricing under certain circumstances, and while that statute does give some guidance on how pricing is determined to be excessive, it leaves the ultimate decision to the discretion of the trial court. If the legislature placed that decision in the hands of a trial court in some circumstances, I see no reason the trial court could not make a similar determination in other circumstances.

I would also note that this Court need not hold that excessive pricing can support a claim under Section 75-1.1 for all types of consumer transactions. Each market is different and practices vary across markets. Recognizing this, this Court has observed that "[w]hether a trade practice is unfair or deceptive usually depends upon the facts of each case and the impact the practice has in the marketplace." *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981) (citation omitted). In this case we must simply consider whether the actual fees charged by defendant

---

[8] While plaintiffs have relinquished any claims under section 24-8, I do not believe we are barred from considering how that statute informs our reading of section 75-1.1 claims.

constitute an unfair or deceptive trade practice. Here, given the broad language of section 75-1.1 and the legislature's existing regulation of the mortgage lending industry, I would hold that plaintiffs' claims for excessive pricing should be allowed to proceed.

However, as a result of Nancy Guyton's affidavit and testimony, genuine issues of material fact remain regarding whether defendant's fees were excessive. While Ms. Guyton's affidavit states that the fees charged to plaintiffs (amounts of $1,180.00 and $1,145.00) were "substantially in excess of a reasonable fee and were substantially in excess of what would have been charged for closing services for such loans by North Carolina attorneys" and placed the maximum customary cost for the services provided here at not exceeding four hundred dollars, Ms. Guyton stated in her deposition that given the hours spent on a closing and the normal rate for attorney time, a typical residential closing cost would have been between eight hundred and fifty dollars to fifteen hundred dollars. She did not discuss reasonable fees for closings performed by non-attorneys. Given this omission, I would hold that genuine issues of material fact remain regarding whether defendant overcharged for its closing fee and would remand accordingly.

For the reasons stated above, I respectfully dissent.

Justice BEASLEY dissenting.

When the undisputed facts demonstrate that defendant bank charged plaintiffs for a service not actually provided, plaintiffs are entitled to summary judgment on their unfair and deceptive practice claim. Because the majority mischaracterizes the basis for plaintiffs' claim to be a misrepresentation and concludes that summary judgment was improperly granted for plaintiffs, I respectfully dissent.

This case involves several issues: (1) whether proof of actual reliance is required to recover; (2) whether there is a genuine issue of material fact regarding whether plaintiffs received discounted loans; (3) whether summary judgment was properly granted to plaintiffs on their unfair and deceptive practice claim as to the loan fees; and (4) whether summary judgment was properly granted to plaintiffs on their unfair and deceptive practice claim as to the closing fees. Each will be discussed in turn.

The standard of review for an order granting summary judgment is de novo. *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004) (citation omitted). "Summary judgment is appropriate where 'there is no genuine issue as to any material fact' and 'any party is entitled to a judgment as a matter of law.'" *Id.* (quoting N.C. R. Civ. P. 56(c)).

Section 75-1.1 of the North Carolina General Statutes declares "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or

practices in or affecting commerce" to be "unlawful." N.C.G.S. § 75-1.1(a) (2011).

The General Assembly has defined "commerce" to mean "all business activities,

however denominated, but . . . not include[ing] professional services rendered by a

member of a learned profession." *Id*. § 75-1.1(b) (2011). This Court has established

three elements that compose an unfair and deceptive practices claim:

> In order to establish a *prima facie* claim for unfair trade[9]
> practices, a plaintiff must show: (1) [the] defendant
> committed an unfair or deceptive act or practice, (2) the
> action in question was in or affecting commerce, and (3)
> the act proximately caused injury to the plaintiff. A
> practice is unfair if it is unethical or unscrupulous, and it
> is deceptive if it has a tendency to deceive.

*Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001) (citations omitted).

The majority incorrectly characterizes plaintiffs' unfair and deceptive

practice claim as one based on misrepresentation and thus incorrectly requires

proof of actual reliance to recover under section 75-1.1. The Court of Appeals

correctly concluded that plaintiffs' unfair and deceptive practice claim was based on

overcharging and that plaintiffs need not prove actual reliance.

Because the majority's error begins with its characterization of the basis for

plaintiffs' claim, I begin my analysis there. A claim for overcharging is actionable

under section 75-1.1.

---

[9] Although references to the acts proscribed by this statute as "trade practices" persist in our caselaw, the word "trade" was removed from the statute in 1977. *See* 1977 N.C. Sess. Laws ch. 747, § 1.

This is a claim for overcharging rather than excessive pricing. The majority does not definitively bar future plaintiffs from arguing that excessive pricing constitutes an unfair and deceptive practice, and correctly so. Claims for excessive pricing can prevail under certain circumstances. *See, e.g.*, N.C.G.S. § 14-344 (2011) (prohibiting the sale of admission tickets for more than face value, plus tax and a reasonable service fee); *Id.* § 75-38 (2011) (prohibiting price gouging in times of emergency); *Rite Color Chem. Co. v. Velvet Textile Co.*, 105 N.C. App. 14, 22, 411 S.E.2d 645, 650 (1992) (assuming without deciding that an unconscionable contract may provide a basis for an unfair and deceptive practice claim (citations omitted)). We have previously found that the purpose of section 75-1.1 is to "protect the consuming public." *Skinner v. E.F. Hutton & Co., Inc.*, 314 N.C. 267, 275, 333 S.E.2d 236, 241 (1985) (citation and quotation marks omitted). The legislature may have found price gouging during times of emergency to be particularly distasteful, but nothing appears in section 75-1.1 to indicate that consumers should not be protected from excessive pricing.

Regardless of whether a party asserting excessive pricing, standing alone, can state a claim for an unfair and deceptive practice, charging for a good or service never received is an unfair and deceptive practice that is distinct from excessive pricing. *See Sampson-Bladen Oil Co. v. Walters*, 86 N.C. App. 173, 177, 356 S.E.2d 805, 808 ("[I]t seems plain to us, and we so hold, that systematically overcharging a customer . . . is an unfair trade practice squarely within the purview of G.S. 75-1.1 .

. . ."), *disc. rev. denied*, 321 N.C. 121, 361 S.E.2d 597 (1987). In *Sampson-Bladen Oil*, the plaintiff charged the defendant over a two-year period for thousands of gallons of oil that the defendant did not actually receive. *Id.* at 174, 356 S.E.2d at 806-07. The court in *Sampson-Bladen Oil* stated its conclusion briefly; however, the Court of Appeals has since interpreted *Sampson-Bladen Oil* as concluding that false invoices showing the amount of goods used and amount of money owed have a tendency to deceive and therefore constitutes an unfair and deceptive practice. *Noble v. Hooters of Greenville (NC), LLC*, 199 N.C. App. 163, 169, 681 S.E.2d 448, 453 (2009), *disc. rev. dismissed*, 363 N.C. 806, 690 S.E.2d 706 (2010).

The rationale of *Sampson-Bladen Oil* is persuasive and its facts are similar to those in this case. Essentially, defendant bank falsified an invoice regarding the amount of money plaintiffs owed in that it charged plaintiffs a discounted loan fee when defendant bank did not provide discounted loans to plaintiffs. The plaintiffs' claim is not that the cost of their loans was too high in the aggregate, which would be a case of excessive pricing, or that they were told they would receive a discounted loan, which would be a case of misrepresentation; their claim is that they were charged a fee that they should not have been charged at all. There is no difference between charging a customer for oil he did not receive and charging a customer a fee for a service not rendered.

The majority's analysis rewrites the fact statement in *Sampson-Bladen Oil* to say that these plaintiffs, like the customer in *Sampson-Bladen*, base their claims on

a misrepresentation. The customer in *Sampson-Bladen* sought recovery on the basis of overcharging, not on the basis of a misrepresentation. The word "overcharge," or a variation thereof, is used eight times in the Court of Appeals' fact statement. *See Sampson-Bladen*, 86 N.C. App. at 173-75, 356 S.E.2d at 806-07. The term "misrepresentation" appears nowhere in the Court of Appeals' opinion.

Based on the majority's opinion and defendant's and plaintiffs' briefs, it appears that the terms "actual deception" and "actual reliance" are unclear. The majority incorrectly concludes that reliance is required to recover under section 75-1.1. An overview of the history of the three elements required for an unfair and deceptive practice claim should clarify the distinction between actual deception and actual reliance.

We did not precisely define an unfair and deceptive practice claim as having three elements until 2000, after our decision in *Pearce v. American Defender Life Insurance Co.*, 316 N.C. 461, 343 S.E.2d 174 (1986). *See Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000) (citing *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 131 N.C. App. 242, 252, 507 S.E.2d 56, 63 (1998), for the three-part test). Nonetheless, our language in *Pearce* clearly described the elements to which we were referring in discussing actual deception and actual reliance. We stated, "Under the facts of this case, Mrs. Pearce must first demonstrate that Ms. Wynne's letter had the capacity or tendency to deceive. Unlike a claim based upon fraud, proof of actual deception is not necessary."

*Pearce*, 316 N.C. at 470-71, 343 S.E.2d at 180 (citation omitted). With this context, it is apparent that we were referring to the first element of whether the defendant committed a deceptive act or practice. We further declared, "But the second requisite to making out a claim under this statute is similar to the detrimental reliance requirement under a fraud claim. It must be shown that the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation." *Id.* at 471, 343 S.E.2d at 180. We referred to proximate cause as the "second requisite"; however, proximate cause is now considered the third element. *See Gray*, 352 N.C. at 68, 529 S.E.2d at 681. Importantly, we did not say that actual reliance was required; we merely stated that actual reliance—an element of a fraud claim—was *similar* to the proximate cause element of an unfair and deceptive practice claim. Thus, actual deception and actual reliance refer to different elements of an unfair and deceptive practice claim.[10]

Our case law demonstrates that neither actual reliance nor actual deception is required for proximate cause. Generally, the crux of proximate cause is the

---

[10] The Court of Appeals has held that actual deception is the equivalent of actual reliance and therefore has held that actual reliance is not required. *See, e.g.*, *Cullen v. Valley Forge Life Ins. Co.*, 161 N.C. App. 570, 580, 589 S.E.2d 423, 431 (2003) ("Moreover, our Courts have clearly held that *actual* deception is not an element necessary under N.C. Gen. Stat. § 75-1.1 to support an unfair or deceptive practices claim. Accordingly, actual reliance is not a factor." (internal citations omitted)), *disc. rev. denied sub nom. Santomassimo v. Valley Forge Life Ins. Co.*, 358 N.C. 377, 598 S.E.2d 138 (2004). The Court of Appeals ultimately reached the correct result in *Cullen*, but did so under flawed logic that the terms refer to the same element of an unfair and deceptive practice claim, which they do not, as explained herein.

foreseeability of an injury. *E.g., Hart v. Curry*, 238 N.C. 448, 449, 78 S.E.2d 170, 170 (1953). The three-part test from *Dalton*, outlined above, does not include a requirement of detrimental reliance. While it appears that *Howerton* supports defendant's position that actual reliance is required, a closer reading of *Howerton* reveals that the plaintiff there based his unfair and deceptive practice claim on fraud. 358 N.C. at 443, 469-70, 597 S.E.2d at 678, 693. Fraud is merely one way to prove an unfair and deceptive practice, but *Pearce* does not require actual reliance unless the plaintiff relies on fraud as part of his claim. *Pearce*, 316 N.C. at 470-71, 343 S.E.2d at 180.

The majority depends heavily on *Pearce*. In that case we looked at whether the plaintiff's husband actually relied on the insurance company's statements. *Id.* at 472, 343 S.E.2d at 181. The majority fails to note, however, that *Pearce*, like *Howerton*, involved a fraud claim and an unfair and deceptive practice claim based upon a misrepresentation, unlike the present case. *Id.* at 467, 472, 343 S.E.2d at 178, 181 (stating that the plaintiff asserted, *inter alia*, claims for fraud and unfair and deceptive practices and that the unfair and deceptive practice claim was based upon a misrepresentation).

The majority again misuses *Sampson-Bladen Oil* in requiring reliance. As stated before, the claim in *Sampson-Bladen Oil* was based on systematic overcharging rather than a misrepresentation. The Court of Appeals did not require reliance because the claim was not based on a misrepresentation, and we

should not require reliance on these analogous facts when plaintiffs argue that defendants overcharged them and thus committed an unfair and deceptive practice.

Recognizing a claim for overcharging and not requiring reliance in this case does not expand North Carolina law. The statutory law is clear and this Court's precedent is well established. The majority's conclusion flouts the General Assembly's intent to "establish an effective private cause of action for aggrieved consumers in this State. . . . because common law remedies had proved often ineffective." *Marshall v. Miller*, 302 N.C. 539, 543, 276 S.E.2d 397, 400 (1981). This Court has been consistent in condemning a practice as unfair and deceptive when it "offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.* at 548, 276 S.E.2d at 403; *see also Dalton*, 353 N.C. at 656, 548 S.E.2d at 711; *Gray*, 352 N.C. at 68, 529 S.E.2d at 681; *Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 263, 266 S.E.2d 610, 621 (1980), *disavowed in part on other grounds by Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 569, 374 S.E.2d 385, 391-92 (1988). As the Court of Appeals has aptly asserted, "[T]he fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience . . . ." *Harrington Mfg. Co. v. Powell Mfg. Co.*, 38 N.C. App. 393, 400, 248 S.E.2d 739, 744 (1978), *disc. rev. denied and cert. denied*, 296 N.C. 411, 251 S.E.2d 469 (1979). Against the background of human experience and ordinary common sense, charging a consumer a fee for a service not rendered is "immoral, unethical,

oppressive, unscrupulous, [and] substantially injurious to consumers." *Marshall*, 302 N.C. at 548, 276 S.E.2d at 403. The majority's unfounded narrowing of section 75-1.1 creates precisely the situation the General Assembly sought to avoid: leaving aggrieved consumers with ineffective common law remedies to combat unfair and deceptive practices.

The majority's conclusion that reliance is required and that a plaintiff must "have affirmatively incorporated the alleged misrepresentation into his or her decision-making process" and demonstrate that he would "have avoided the injury all together," opens the door to an array of new fees intended to pad a company's bottom line rather than to reflect the fair cost of a good or service provided to the consumer. For example, under the majority's reasoning, a bank may charge a "paper statement fee" to a customer who has selected electronic monthly statements offered by the bank, a "safety deposit box rental fee" to a customer who has not rented a safety deposit box, and a "teller transaction fee" on a transaction for which the customer only used the ATM. As long as the customer had some other reason that he might have chosen to do business with the bank, such as being an existing account holder, he can never show that, but for the misrepresentation, he would not have conducted business with the bank. The customer would have to show that he or she would have avoided the transaction entirely. The customer has no recourse because the fee was not a part of his decision-making process, despite the existence of an unethical and unfair practice that charges the consumer a fee for a good or

service he did not receive. It is fundamentally unfair to pay a fee for a good or service and receive nothing corresponding to that fee in return.

Further, the majority's holding blurs the line between fraud and an unfair and deceptive practice claim. Presumably, the General Assembly is aware of the elements of fraud, though not codified by statute, and has chosen not to include the element of actual reliance as part of the proximate cause requirement for an unfair and deceptive practice. Furthermore, this Court has recognized that the General Assembly "intended to establish an effective private cause of action for aggrieved consumers in this State. . . . because common law remedies had proved often ineffective." *Marshall*, 302 N.C. at 543, 276 S.E.2d at 400. Fraud is one example of the common law remedies that were ineffective in eradicating unfair and deceptive practices. Thus, proximate cause for an unfair and deceptive practice claim requires that a plaintiff prove that the defendant's deceptive act could foreseeably cause injury, and in fact caused injury, if the plaintiff is not relying on fraud to prove an unfair and deceptive practice. *See Dalton*, 353 N.C. at 656, 548 S.E.2d at 711.

Plaintiffs' claim is not based on fraud, unlike *Pearce* and *Howerton*. Defendant bank did not represent that it would provide a discounted loan and then fail to do so. Instead, plaintiffs' claim is based on the contention that defendant bank charged a discount loan fee and did not provide a discounted loan. Because plaintiffs' case is not based on fraud, plaintiffs need not prove actual reliance,

consistent with *Sampson-Bladen Oil*. Plaintiffs need only prove that: "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to . . . plaintiff[s]." *Id.*

Plaintiffs demonstrated the following in support of their summary judgment motion: Defendant bank charged a loan discount fee for a service that was not provided, an act that has a tendency to deceive and is unethical, satisfying the first element. The second element has not been challenged, and loan services are included within the definition of "commerce." *See Johnson*, 300 N.C. at 261-62, 266 S.E.2d at 620. Plaintiffs can also show that defendant bank's fee proximately caused their injuries: defendant bank's deceptive act of charging a discount fee on an undiscounted loan could foreseeably cause a monetary loss and in fact caused a monetary loss.

The majority further incorrectly concludes that there is an issue of material fact regarding whether plaintiffs received discounted loans. Summary judgment for the party with the burden of proof, in this case plaintiffs, is appropriate "when the opposing party has failed to introduce any materials supporting his opposition" to the motion. *Kidd v. Early*, 289 N.C. 343, 370, 222 S.E.2d 392, 410 (1976).

Defendant failed to support its opposition to plaintiffs' motion. Plaintiffs asserted that they did not receive a discounted loan of any kind. Mr. Grace's affidavit in support of defendant establishes that plaintiffs did not receive a *temporary* loan discount, but it fails to demonstrate that plaintiffs received a *long-*

*term* loan discount. Mr. Grace's affidavit fails to support defendant's opposition to the motion for summary judgment; therefore, summary judgment for plaintiffs was appropriate.

Finally, I disagree with the majority's reasoning regarding the closing fees. I fail to see how "enter[ing] into their loan transactions freely and without any compulsion" exempts these kinds of transactions from the scope of the statutes intended to protect the consumer from predatory, unfair, and deceptive practices. Most consumers likely enter into transactions that later turn out to be unfair and deceptive "freely and without any compulsion." *Id.* If entering a transaction freely is now a defense to an unfair and deceptive practice claim, then the entire purpose of Chapter 75 and its corollaries elsewhere in the General Statutes is void.